UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

IN RE:
C.R. STONE CONCRETE
CONTRACTORS, INC.,                                    Chapter 7
            DEBTOR.                                   Case No. 05-11119-WCH
_____

JOSEPH BUTLER, CHAPTER 7 TRUSTEE
OF THE ESTATE OF C.R. STONE
CONCRETE CONTRACTORS, INC.,
            PLAINTIFF,
                                                      Adversary Proceeding
v.                                                    No. 05-1307

RICHARD ANDERSON, GILLIAN
WELBY, JOHN MARINI, PLUMB HOUSE,
INC., DALTON BUILDERS, INC., JOHN
MARINI MANAGEMENT COMPANY,
LENOX-NORWOOD LLC, AND THE
FRAMING COMPANY, INC.,
            DEFENDANTS.
_____

**MEMORANDUM OF DECISION**

I. **INTRODUCTION**

The matter before the Court is the Plaintiff's Renewed Motion to Substitute (the "Motion

to Substitute") filed by the plaintiff, Joseph Butler (the "Trustee"), Chapter 7 trustee of the estate

of C.R. Stone Concrete Contractors, Inc. (the "Debtor"), and the Memorandum of Charles G.

Krattenmacher, Jr. in Opposition to Plaintiff's Renewed Motion to Substitute (the "Opposition")

filed by Charles G. Krattenmacher, Jr. ("Krattenmacher"), the executor of the estate of Richard

Anderson, and assented to by defendants Plumb House, Inc. ("Plumb House"), Dalton Builders,

Inc. ("Dalton"), John Marini ("Marini"), John Marini Management Company ("Marini

1

Management"), Lenox-Norwood LLC ("Lenox"), The Framing Company, Inc. (the "Framing Co.," collectively with Marini, Marini Management, and Lenox, the "Marini Defendants"),[1] and Gillian Welby ("Welby").   In light of the passing of the defendant Richard Anderson ("Anderson"), the Trustee moves to substitute Krattenmacher as a party defendant in this proceeding pursuant to Fed. R. Civ. P. 25(a), made applicable to adversary proceedings by Fed. R. Bankr. P. 7025.  Kattenmacher opposes on the basis that the Motion to Substitute is untimely and that the Trustee's claims against Anderson were extinguished upon his death.  For the reasons set forth below, I will grant the Motion to Substitute in part and deny it in part.

## II. BACKGROUND

Because a detailed account of the complex procedural history and factual allegations underlying the present adversary proceeding are set forth in my prior decisions, which I incorporate herein by reference, I will limit my recitation to those necessary to understand the present dispute.[2]

The Debtor was formerly a duly organized Massachusetts corporation that operated a business performing concrete contracting, design, and installation in all phases of construction.[3] Christopher Stone ("Stone"), the former president and principal of the Debtor, incorporated the Debtor in 2000, and operated it with increasing profitability between the years of 2001 and

---

[1] Identification of these parties as the "Marini Defendants" is meant for ease of reference and does not constitute a finding that these entities are the alter ego of Marini.

[2] *See Butler v. Anderson (In re C.R. Stone Concrete Contractors, Inc.),* No. 05-1307, 2011 WL 3207204 (Bankr. D. Mass. July 26, 2011) (denying the Trustee's original motion to substitute without prejudice for failure to serve the motion in the manner required by Fed. R. Civ. P. 25(a)(3)); *Butler v. Anderson (In re C.R. Stone Concrete Contractors, Inc.),* 434 B.R. 208 (Bankr. D. Mass. 2010) (denying the Marini Defendants' motion to dismiss the present adversary proceeding); *C.R. Stone Concrete Contractors, Inc. v. Anderson (In re C.R. Stone Concrete Contractors, Inc.),* 346 B.R. 32 (Bankr. D. Mass. 2006) (denying the Trustee's motion to approve a proposed settlement with the defendants).

[3] Amended Complaint, Docket No. 146, ¶ 14.

2004.[4]  By 2004, the Debtor "was the largest non-union cast in place concrete contractor in Massachusetts, with 140 employees during peak periods, and was on track to achieve its highest net profit ever."[5]

Anderson was the principal and "primary decision maker" of Plumb House and Dalton.[6] Plumb House and Dalton are Massachusetts corporations engaged in the business of general contracting.[7]  The Debtor was a subcontractor for Plumb House on projects located in Quincy and Waltham, Massachusetts (the "Quincy Project" and the "Waltham Project," respectively).[8] Anderson had attempted to enter the cast in place concrete business many years before with a company known as Advance Concrete, Inc., but the business was unsuccessful and Advance Concrete, Inc. was dissolved in 1998.[9]

Welby was employed by the Debtor as a project manager between December 18, 2003, and January 7, 2005.[10]  To effectuate her employment, she entered into an employment agreement and a non-compete agreement with the Debtor.[11]  As a project manager, Welby was responsible for the Debtor's project accounting, billing, and change order submissions on the various projects for which the Debtor was a subcontractor.[12]  Welby, who the Trustee alleges

---

[4] *Id.* at ¶ 15.

[5] *Id.*

[6] *Id.* at ¶ 2.

[7] *Id.* at ¶¶ 5-6.

[8] *Id.* at ¶ 16.

[9] *Id.* at ¶ 17.

[10] *Id.* at ¶¶ 3, 20.

[11] *Id.* at ¶¶ 20-21.

[12] *Id.* at ¶¶ 3, 27.

was also the "former significant other of . . .Stone,"[13] was not authorized to sign certain job documents, such as requisitions and lien waivers.[14]

Marini is the principal and "primary decision maker" of Marini Management, Framing Co., and Lenox.[15] Marini Management is a Massachusetts corporation in the business of general contracting.[16] Lenox is a Massachusetts corporation which owns a construction site in Norwood, Massachusetts (the "Norwood Project").[17] The Norwood Project is managed by Framing Co. and Marini Management is the general contractor on that site.[18] The Debtor was subcontracted to perform concrete work for the Norwood Project.[19] The Trustee alleges that Marini and Anderson were friends and business associates.[20]

The Trustee asserts that the Debtor delivered "substantial amounts of expensive equipment, materials and tools" to each of the three projects to perform the subcontracts.[21] During the fall and winter of 2004, while the Debtor was working on the Norwood, Quincy and Waltham Projects, Welby and Anderson, with "substantial assistance" from Marini, allegedly "joined together to strip [the Debtor's] lucrative business away from it and transfer it to

---

[13] *Id.* at ¶ 19.

[14] *Id.* at ¶ 27.

[15] *Id.* at ¶ 4.

[16] *Id.* at ¶¶ 7, 22.

[17] *Id.* at ¶¶ 8, 22.

[18] *Id.* at ¶¶ 9, 22.

[19] *Id.* at ¶ 23.

[20] *Id.* at ¶ 18.

[21] *Id.* at ¶ 28. Specifically, the Trustee alleges that the Debtor delivered $800,000 worth of concrete forms, supplies, equipment, tools and a forklift to the Norwood Project, a crane and construction materials with a value of $330,000 to the Waltham Project, and $1,120,000 of property to the Quincy Project consisting of a crane and various other concrete construction equipment. Id.

Anderson."[22]  To this end, the Trustee alleges that Welby substantially under billed the Debtor's work on the projects and forged Stone's signature on lien releases and requisition orders.[23]  At the same time, Anderson allegedly directed Plumb House to withhold payments to the Debtor.[24] The Trustee further alleges that all the defendants communicated with the Debtor's suppliers and convinced them to begin demanding payment before such payments were due under their respective agreements.[25]  As a result of these actions, the Debtor's cash flow was effectively choked off by January, 2005.[26]

On January 7, 2005, Anderson gave the Debtor a Notice of Termination which terminated the Debtor's subcontracts for the Quincy and Waltham Projects, citing the Debtor's failure to pay its suppliers.[27]  Thereafter, "Anderson, with Welby's and Marini's active participation and assistance, in furtherance of the Defendant's conspiracy, either hired or drove away virtually all of [the Debtor's] employees, seized all of [the Debtor's] property at the three projects in question, took over [the Debtor's] subcontracts with Plumb House and Marini Management and . . . commenced work at all three projects in place of [the Debtor] (and with [the Debtor's] employees, equipment and with the cash owed to [the Debtor])."[28]

---

[22] *Id.* at ¶ 30.

[23] *Id.* at ¶¶ 32, 33, 35, 38.

[24] *Id.* at ¶ 34.

[25] *Id.* at ¶ 37.

[26] *Id.* at ¶ 41.

[27] *Id.* at ¶ 43.

[28] *Id.* at ¶ 44.

Case 05-01307   Doc 227   Filed 12/19/11   Entered 12/19/11 11:54:17   Desc Main
Document   Page 6 of 32


As a direct result of these actions, the Debtor was compelled to file a voluntary Chapter 11 petition on February 18, 2005.[29]  On March 7, 2005, the Debtor, while acting as a debtor-in-possession, filed a complaint for turnover against the Anderson Defendants and the Marini Defendants.[30]  On the eve of a hearing on the matter, Anderson informed Debtor's counsel that Plumb House would voluntarily return all of the Debtor's property that the Anderson Defendants had seized.[31]  On March 23 and 24, 2005, Plumb House returned property which had been converted by Anderson Defendants.  Nonetheless, the Trustee alleges that much of the property returned was damaged, while other property, including tools, "poles, brackets, shores, MEP shores, panels, corners, hardware, whaling, and staging brackets," was never returned at all.[32]

The present adversary proceeding, which was subsequently consolidated with several other adversary proceedings against the same defendants and designated as the lead case, was commenced on April 15, 2005.  On August 17, 2005, however, the Debtor's case was converted to one under Chapter 7 and prosecution of the adversary proceedings fell to the Trustee.  Since that time, the parties have unsuccessfully attempted to settle the dispute.[33]  After a period of inactivity[34] and several attempts by the defendants to dismiss the adversary proceedings, the Trustee filed a further amended complaint on July 14, 2010, asserting the following causes of action against Anderson: Count I – Damages for Failure and Refusal to Turnover CR Stone's

---

[29] *Id.* at ¶ 65.

[30] *Id.* at ¶ 68.

[31] *Id.* at ¶ 69.

[32] *Id.* at ¶¶ 71, 73.

[33] *See In re C.R. Stone Concrete Contractors, Inc.*, 346 B.R. at 32.

[34] Due to a clerical error, a motion to dismiss filed by the Marini Defendants remained under advisement for five years before a decision was rendered. *See In re C.R. Stone Concrete Contractors, Inc.*, 434 B.R. at 217.

Business and Property in Accordance with 11 U.S.C. § 542; Count II – Unauthorized Post-Petition Use of the Debtor's Property Without Compensation Pursuant to 11 U.S.C. § 549; Count III - Fraudulent Transfer Pursuant to 11 U.S.C. § 548; Count IV – Conversion of CR Stone's Property; Count V – Civil Conspiracy; Count X – Interference with Advantageous Contractual Relationships; Count XI – Violations of Massachusetts General Law Chapter 93A; Count XII – Equitable Subordination Pursuant to 11 U.S.C. § 510; Count XIV – Violations of the Automatic Stay; Count XVII – Interference with Contract Rights; Count XVIII - Interference with Advantageous Business Relations; Count XIX – Equitable Estoppel; and Count XX – Constructive Trust and An Accounting.[35]

On November 17, 2010, Anderson passed away. The Trustee filed a Suggestion of Death and Motion for Stay of Case Deadlines with the assent of the defendants on December 6, 2010. I granted the motion the following day. On March 18, 2011, the parties filed a Joint Motion to Establish New Case Deadlines (the "Joint Motion") which included, *inter alia*, a deadline of April 15, 2011 for the Trustee to file a motion to substitute executor of Anderson's estate as a party defendant.[36] I granted the Joint Motion on March 25, 2011, expressly approving the deadlines set forth therein.

As expressly contemplated by the Joint Motion, the Trustee filed his first motion to substitute on April 15, 2011. On April 29, 2011, however, Plumb House and Dalton Builders, with the assent of Welby and the Marini Defendants, filed an opposition, asserting that the Motion to Substitute was untimely or that the claims against Anderson did not survive his death

---

[35] Amended Complaint, Docket No. 146, ¶¶ 75-113, 128-141, 144-146, 153-172.

[36] Docket No. 173.

pursuant to Mass. Gen. Laws ch. 223, § 1. I heard the matter on May 18, 2011, and at the conclusion of the hearing, I took the matter under advisement.

On July 26, 2011, I entered a Memorandum of Decision and separate order denying the Trustee's first motion to substitute on the grounds that Fed. R. Civ. P. 25(a)(3) required the motion to be served by summons.[37] The Motion to Substitute followed on July 29, 2011. On the same date, I issued an order directing the Clerk of Court to issue a summons on Krattenmacher and scheduling the matter for hearing on September 14, 2011. On August 1, 2011, the Trustee filed a certificate of service indicating that Krattenmacher was served by first class mail. Krattenmacher filed the Opposition on August 26, 2011. At the September 14, 2011 hearing, both parties appeared and presented oral argument. Thereafter, I once again took the matter under advisement.

## III. <u>POSITIONS OF THE PARTIES</u>

<u>The Trustee</u>

First, addressing Krattenmacher's objection regarding the timeliness of the Motion to Substitute, the Trustee argues that it was filed well within 90 days of Krattenmacher's appointment and by the deadline set forth in the parties' stipulation, making it disingenuous for Krattenmacher to claim otherwise.[38] In any event, the Trustee contends that the deadline may be extended under Fed. R. Civ. P. 6.

Turning to the merits of the Motion to Substitute, the Trustee asserts that all the claims set forth in the Complaint against Anderson survive his death. First, with respect to Count I, the

---

[37] *In re C.R. Stone Concrete Contractors, Inc.*, 2011 WL 3207204 at *2. I further noted that it was doubtful that either Plumb House or Dalton had standing to object to the first motion to substitute.

[38] Although I need not reach this issue, I note that only Plumb House and Dalton assented to the deadline to file the Motion to Substitute set forth in the Joint Motion to Establish New Case Deadlines, as Krattenmacher was not yet a party to the case.

Trustee seeks turnover from the Defendants as a result of them having allegedly usurped and expropriated the entirety of the Debtor's business, including both tangible and intangible property. The Trustee contends that these claims are analogous to damage to property and replevin, which expressly survive Anderson's death under Mass. Gen. Laws ch. 228, § 1 (the "Survivorship Statute").[39] Moreover, the Trustee argues, albeit without citation, that the Survivorship Statute does not limit claims to personal property to only tangible property.

In Count II, the Trustee seeks recovery for the post-petition use, retention, custody, and control over the Debtor's property, while Count IV states a claim for conversion of the Debtor's assets. He asserts that these are clearly claims for "goods taken or carried away or converted," which are enumerated under the Survivorship Statute.[40] To the extent that Krattenmacher argues that Anderson himself did not individually take or use the property, the Trustee contends that is matter for trial.

With respect to Count III, which is framed as a claim for damages arising from a fraudulent transfer, the Trustee asserts the damages are for "goods taken or carried away or converted"[41] without fair consideration "under the statutory mechanism of Section 548."[42] He further contends that Krattenmacher has not cited any authority for the proposition that such a claim is not viable. To the contrary, the Trustee states that "the very relief sought under such

---

[39] *See* Mass. Gen. Laws ch. 228, § 1(d).

[40] *See* Mass. Gen. Laws ch. 228, § 1(c).

[41] *See id.*

[42] Plaintiff's Memorandum in Reply to Plumb House, Inc. and Dalton Builders, Inc.'s Opposition to Plaintiff's Motion to Substitute ("Plaintiff's Memorandum"), Docket No. 194 at p. 6. *See* 11 U.S.C. § 548.

Code sections and alleged in the Proposed Amended Complaint clearly describe claims that survive the defendant's death under the Survivorship Statute."[43]

Through Count V, the Trustee seeks damages arising from a civil conspiracy by which the defendants, Anderson included, "pursuant to a common design to commit a tortious act against [the Debtor] . . . tortious[ly] seiz[ed] and expropriat[ed] of all [the Debtor's] property . . . for the benefit of the Defendants."[44]  As such, he contends that such claims are for damages to or recovery of personal property under the Survivorship Statute.[45]

In Count X, the Trustee alleges that Anderson "wrongfully, intentionally and maliciously induced [the Defendants] to withdraw from . . . [or] breach their subcontracts with [the Debtor]," causing substantial damage to the Debtor.[46]  Therefore, the Trustee contends that the claim survives under the Survivorship Statute to the extent it is for damage to personal property.[47]

By Count XI, the Trustee seeks damages against Anderson for unfair or deceptive acts or practices under Mass. Gen. Laws ch. 93A, § 11.  While he concedes that some claims under Mass. Gen. Laws ch. 93A abate upon the death of the defendant, the Trustee asserts that where the claim is for damage to personal property, including intangibles, the claim survives.  Because he contends that many of these claims survive Anderson's death, the Trustee suggests that the most efficient course of action would be to allow him to go forward and sort the survival issues out in the end.

---

[43] *Id.* at p. 7.

[44] *Id.*

[45] *See* Mass. Gen. Laws ch 228, §§ 1(c), (d).

[46] Plaintiff's Memorandum, Docket No. 194 at p. 7.

[47] *See* Mass. Gen. Laws ch. 288, § 1(d).

Lastly, with respect to Counts XII, XIV, XVII, XVIII, XIX, and XX, the Trustee argues, without further elaboration, that these tort claims remain viable under the Survivorship Statute to the extent that they either seek recovery for goods taken or carried away or converted, or for damage to property.[48]   He further asserts that Krattenmacher has not asserted any argument or rationale in support of his argument to the contrary.

Krattenmacher

To start, Krattenmacher asserts that the Trustee failed to serve the Motion to Substitute as required by Fed. R. Civ. P. 4 because service was effectuated through first class mail. Additionally, he argues that the action must be dismissed as extremely untimely because the Motion to Substitute was not filed until July 29, 2011, nearly five months after the 90 day deadline as provided for in Fed. R. Civ. P. 25(a)(1).  Moreover, Krattenmacher contends that the Trustee has made no effort to establish excusable neglect for this delay.[49]

With respect to Counts I and IV for turnover and conversion, respectively, Krattenmacher asserts that the Trustee's claims fall outside the Survivorship Statute to the extent that they are for the alleged usurpation of the Debtor's business, including intangible business property. Relying on *Central Nat'l-Gottesman, Inc. v. Rodman & Rodman, P.C.*,[50] he argues that damage to personal property under the Survivorship Statute excludes intangible property.   Similarly,

---

[48] These counts are: Count XII – Equitable Subordination Pursuant to 11 U.S.C. § 510; Count XIV – Violations of the Automatic Stay; Count XVII – Interference with Contract Rights; Count XVIII - Interference with Advantageous Business Relations; Count XIX – Equitable Estoppel; and Count XX – Constructive Trust and Accounting.

[49] Though not relevant to my decision, Krattenmacher also argues that the first motion to substitute was similarly untimely.

[50] *Cent. Nat'l Gottesman, Inc. v. Rodman & Rodman, P.C.*, No. 874791, 1998 WL 1184176 *2 (Mass. Super. Ct. Sept. 30, 1998) (*citing Piper v. Childs*, 290 Mass. 560, 565 (1935)).

11

citing *Keating v. Boston Elevated Ry. Co.*,[51] Krattenmacher asserts that damage to a pecuniary interest does not amount to damage to personal property under the Survival Statute.

As to Counts II, III, X, XI, and XVII, Krattenmacher argues that the Trustsee has not stated a cognizable claim against Anderson because Anderson was merely acting on behalf of Plumb House.  Therefore, he contends that these claims are actually against the other Defendants and not Anderson in his individual capacity.  Alternatively, Krattenmacher seeks dismissal of Count III because a claim for fraudulent transfers is a fraud claim that does not survive a defendant's death under the Survivorship Statute.

Next, Krattenmacher asserts that there is no authority to support survival of Counts XII and XIV, and that Counts V, XVII, XIX, and XX are not among the species of torts specifically identified by the clear language of the Survivorship Statute.  While Krattenmacher concedes that claims for violations of Mass. Gen. Laws ch. 93A that sound in contract survive under the common law, he argues that the bulk of the Trustee's claims under Count XI involve torts that fall outside the Survivorship Statute.

Finally, Krattenmacher notes that I have discretion under Fed. R. Civ. P. 25(a)(1) to deny a motion to substitute even where dismissal is not required by the Survivorship Statute. Therefore, to the extent that I find that any claims survive, he argues I should dismiss them as to Anderson because Dalton and Plumb House remain in the case and the Trustee can obtain the same damages from them.

---

[51] *Keating v. Boston Elevated Ry. Co.*, 209 Mass. 278, 282 (1911).

## IV. DISCUSSION

### A. Adequacy of Service

Krattenmacher's first objection to the Motion to Substitute is that, despite my prior orders, the Trustee failed to serve it as required by Fed. R. Civ. P. 4 because service was effectuated through first class mail.  As I explained in my prior decision, Fed. R. Civ. P. 25(a), made applicable to adversary proceedings by Fed. R. Bankr. P. 7025, requires that "[a] motion to substitute . . . must be served on . . . nonparties as provided in Rule 4,"[52] and "there is no question that the estate representative sought to be substituted for the decedent falls within that category else the Court would have no *in personam* jurisdiction over that nonparty"[53]  Generally, Fed. R. Civ. P. 4(e)(2) identifies the following means to complete service on an individual within a judicial district of the United States:

> (A) delivering a copy of the summons and of the complaint to the individual personally;
> (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
> (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.[54]

While Fed. R. Civ. P. 4(e)(2) applies in adversary proceedings,[55] Fed. R. Bankr. P. 7004(b) expressly provides that:

> Except as provided in subdivision (h), in addition to the methods of service authorized by Rule 4(e)-(j) F.R.Civ.P., service may be made within the United States by first class mail postage prepaid as follows:

---

[52] Fed. R. Civ. P. 25(a)(3), made applicable to adversary proceedings by Fed. R. Bankr. P. 7025.

[53] *In re C.R. Stone Concrete Contractors, Inc.*, 2011 WL 3207204 at *2; *see Atkins v. City of Chicago*, 547 F.3d 869, 873 (7th Cir. 2008); *Barlow v. Ground*, 39 F.3d 231, 233 (9th Cir. 1994); *Bass v. Attardi*, 868 F.2d 45, 50 n. 12 (3rd Cir. 1989); *Ransom v. Brennan*, 437 F.2d 513, 517 (5th Cir. 1971).

[54] Fed. R. Civ. P. 4(e)(2).

[55] Fed. R. Bankr. P. 7004(a)(1)

> (1) Upon an individual other than an infant or incompetent, by mailing a copy of the summons and complaint to the individual's dwelling house or usual place of abode or to the place where the individual regularly conducts a business or profession.[56]

As it is undisputed that the Trustee served the Motion to Substitute on Krattenmacher via first class mail, Krattenmacher's objection is ill taken.

B. Timeliness

As it exists today, Fed. R. Civ. P. 25(a)(1) is the product of a series of amendments aimed at relieving the perceived harsh and inequitable results caused by earlier versions of the rule. "Prior to its amendment in 1963, Rule 25(a)(1) required the court to dismiss a case if no motion for substitution was filed within two years after date of death."[57] Furthermore, extensions were expressly prohibited under Fed. R. Civ. P. 6(b). This created situations where, for example, a cause of action would be dismissed because the plaintiff, through no lack of diligence, did not learn of the death of the defendant within the two years mandated by the rule.[58]

Under the current rule, the time for filing a motion to substitute is not tied to the death of the party, but rather the time when a properly served statement noting the death is made upon the record. Specifically, Fed. R. Civ. P. 25(a)(1), made applicable to adversary proceedings by Fed. R. Bankr. P. 7025, provides in relevant part:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.[59]

---

[56] Fed. R. Bankr. P. 7004(b)(1).

[57] *Grandbouche v. Lovell*, 913 F.2d 835, 836 (8th Cir. 1990).

[58] *See, e.g., Anderson v. Yungkau*, 329 U.S. 482 (1947); *Iovino v. Waterson*, 274 F.2d 41 (2d Cir. 1959).

[59] Fed. R. Civ. P. 25(a)(1), made applicable to adversary proceedings by Fed. R. Bankr. P. 7025.

Although service of a statement noting the death triggers the 90 day deadline as provided for in the rule, the time to file a motion for substitution may now be enlarged or reduced pursuant to Fed. R. Bankr. P. 9006(b) and (c).[60]  Specifically, Fed. R. Bankr. P. 9006(b)(1) provides that:

> Except as provided in paragraphs (2) and (3) of this subdivision, when an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order or (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.[61]

Neither paragraph 2 nor 3 of Fed. R. Bankr. P. 9006(b) prohibit an enlargement of time under these circumstances.[62]

While more flexible in its current form, Fed. R. Civ. P. 25 is still susceptible to a number of practical problems with which courts have struggled.  Just as under the old rule, parties do not always learn of the death in a timely manner.  Moreover, the appointment of an estate representative or the determination of a decedent's successor can be a long process to which the surviving party is not privy.  The rule now attempts to cure these issues by creating a free floating deadline triggered by the service of a statement noting death and allowing for liberal extensions.  In fact, the Advisory Committee Notes to the 1963 amendment indicates that the drafters believed that in most cases the motion to substitute would be made without any party

---

[60] *See* Fed. R. Bankr. P. 9006(b), (c).

[61] Fed. R. Bankr. P. 9006(b)(1).  *See Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993) (finding that despite being couched in mandatory terms, the time to file a motion for substitution under Fed. R. Civ. P. 25(a)(1) may be extended under Fed. R. Civ. P. 6(b), which is substantively similar to Fed. R. Bankr. P. 9006(b)); *Hawkins v. Eads (In re Eads)*, 135 B.R. 380, 384 (Bankr. E.D. Cal. 1991) (the deadline to file a motion for substitution under Fed. R. Bankr. P. 7025 may be enlarged pursuant to Fed. R. Bankr. P. 9006(b)).

[62] *See* Fed. R. Bankr. P. 9006(b)(2), (3).

having previously triggered the deadline.[63]  Therefore, the purpose of the deadline is only to prevent a substituting party from causing an unreasonable delay.

As is standard in litigation, the plaintiff carries a heavier burden under Fed. R. Civ. P. 25, regardless of which party passes away.  To prevent dismissal of the case or the passing of critical deadlines, the plaintiff often must, as the Trustee did here, file a statement noting the death in order to obtain appropriate relief.  As a result, defendants frequently contend that by doing so, the plaintiff triggers, albeit inadvertently, his own limitation period.  Alternatively, a remaining defendant may serve the statement noting death and trigger the limitations period long before an estate representative is appointed.  In either event, the plaintiff finds himself in a situation where the clock is running before he knows the identity of the party he must seek to substitute.

Faced with this very problem, the United States Court of Appeals for the District of Columbia Circuit held that "a suggestion of death does not set in motion Rule 25(a)(1)'s ninety-day limitation unless the suggestion 'identif[ies] the representative or successor . . . who may be substituted as a party.'"[64]  The United States Court of Appeals for the Second Circuit has rejected this view, concluding that "[t]he rule does not require that the statement identify the successor or legal representative; it merely requires that the statement of death be served on the involved parties."[65]  The proper remedy, according to the Second Circuit, is for the moving party to seek extensions until the representative has been identified and can be substituted.[66]

---

[63] Advisory Committee Notes to the 1963 Amendment to Fed. R. Civ. P. 25 ("A motion to substitute may be made by any party or by the representative of the deceased party without awaiting the suggestion of death. Indeed, the motion will usually be so made.").

[64] *McSurely v. McClellan*, 753 F.2d 88, 98 (D.C. Cir. 1985) (*quoting Rende v. Kay*, 415 F.2d 983, 984 (D.C. Cir. 1969)).

[65] *Unicorn Tales, Inc. v. Banerjee*, 138 F.3d 467, 470 (2d Cir. 1998). *See Ray v. Koester*, 85 Fed.Appx. 983, 984 (5th Cir. Jan 21, 2004).

[66] *Id.*

A majority of the other circuits have addressed this problem by focusing on the requirement that the statement of death be served on the involved parties.  Under Fed. R. Civ. P. 25(a)(3), "[a] statement noting death must be served in the same manner" as a motion to substitute.[67]  As explained in my prior decision, "Fed. R. Civ. P. 25(a)(3) does not specifically identify what 'nonparties' must receive service."[68]  In addition to estate representatives, courts have recognized that the "decedent's successor"[69] may include the following:

> (1) the primary beneficiary of an already distributed estate; (2) a person named in a will as the executor of the decedent's estate, even if the will is not probated; or (3) the primary beneficiary of an unprobated intestate estate which need not be probated.[70]

With this in mind, six circuits have held that the limitations period in Fed. R. Civ. P. 25(a)(1) does not begin until the decedent's representative or successor is properly served with the statement noting death.[71]  This yields the same result as the D.C. Circuit's line of cases: the 90 day period will not begin to run until a substitutable party has been identified.

Nevertheless, in *George v. United States*, the United States District Court for the District of Connecticut held that the opposing party is relieved from the requirement of serving the statement noting death on the decedent's successor or representative when such persons are

---

[67] Fed. R. Civ. P. 25(a)(3).

[68] *In re C.R. Stone Concrete Contractors, Inc.*, 2011 WL 3207204 at *2.

[69] Fed. R. Civ. P. 25(a)(1).

[70] *In re Baycol Prod. Litig.*, 616 F.3d 778, 784-785 (8th Cir. 2010) (citations omitted).  *See McSurely v. McClellan*, 753 F.2d at 98; *Rende v. Kay*, 415 F.2d at 985; *Hardy v. Kaszycki & Sons Contractors, Inc.*, 842 F.Supp. 713, 716 (S.D.N.Y. 1993).

[71] *In re Baycol Prod. Litig.*, 616 F.3d at 785 (8th Cir. 2010); *Atkins v. City of Chicago*, 547 F.3d 869, 873 (7th Cir. 2008); *Grandbouche v. Lovell*, 913 F.2d at 837; *Bass v. Attardi*, 868 F.2d 45, 50 (3rd Cir. 1989); *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 962 (4th Cir. 1985); *see also Barlow v. Ground*, 39 F.3d 231, 234 (9th Cir. 1994).

unknown to that party.[72]   While few cases have acknowledged that *George* articulated an exception to the general rule, none have applied it.[73]   In addition to being contrary to the holdings of several circuit level decisions,[74] I find the *George* exception to be contrary to the plain text of the rule and wholly inequitable.   Fed. R. Civ. P. 25(a)(1) is clear: only *service* of a statement noting death starts the limitations period under the rule.[75]   As that is the only requirement under the rule, I cannot fathom why it would be waived under any circumstances, let alone where the only purpose of the opposing party's filing of the statement noting death would be to gain a tactical advantage by starting the limitations period before the decedent's representative or successor has been identified.

Returning to the present case, there is no question that the Suggestion of Death and Motion for Stay of Case Deadlines was not served as required by Fed. R. Civ. P. 4, as expanded by Fed. R. Bankr. P. 7004(b), on Anderson's representative or successor.   Therefore, the 90 day limitations period would not have started before the Motion to Substitute was served on Krattenmacher.   Accordingly, it was timely filed.

C. <u>Whether the Claims Were Extinguished</u>

Under Fed. R. Civ. P. 25(a)(1), substitution of a deceased party is only appropriate to the extent that the claim is not extinguished.[76]   The rule, however, is a procedural one and does not

---

[72] *George v. United States*, 208 F.R.D. 29, 32 (D. Conn. 2001)

[73] *See, e.g.*, *Atkins v. City of Chicago*, 547 F.3d at 873-874 (suggestion of death filed by decedent's lawyer); *Burgos-Yantin v. Municipality of Diaz*, 709 F.Supp.2d 118, 122 (D.P.R. 2010) (finding no statement suggesting death had been filed upon the record); *McSwain v. Suliene*, No. 09-CV-219-BBC, 2010 WL 148185 *1 (W.D. Wis. Jan 11, 2010) (finding no suggestion of death had been made upon the record).

[74] *In re Baycol Prod. Litig.*, 616 F.3d at 785; *Bass v. Attardi*, 868 F.2d at 50; *Fariss v. Lynchburg Foundry*, 769 F.2d at 962.

[75] Fed. R. Civ. P. 25(a)(1) ("If the motion is not made within 90 days after *service* of a statement noting the death, the action by or against the decedent must be dismissed.") (emphasis added).

[76] Fed. R. Civ. P. 25(a)(1).

itself answer the question of whether a claim abates upon the death of a party.  While state law controls the survival of state law claims, federal law governs the survival of federal claims.[77] "As a question of substance, courts must look to each cause of action to determine whether the claim abates."[78]

Before delving into the merits of the Motion to Substitute, I must address several points raised by the parties.  First, the Trustee asserts in his supporting memorandum that Krattenmacher fails to provide rationales or cite supporting authority for his arguments that certain claims do not survive.  While I concur to some extent, I note that the burden under Fed. R. Civ. P. 25(a)(1) is on the moving party to demonstrate that the claims asserted do, in fact, survive.  Therefore, it is incumbent on the Trustee to properly articulate reasons why each of his claims survive Anderson's death under the Survivorship Statute without regard to any objection. Moreover, mere conclusory citations to alternate subparagraphs of the Survivorship Statute are insufficient.[79]  As I previously explained in *Hermosilla v. Hermosilla*, when parties fail to fully flesh out arguments in their papers, "there can be no reasonable expectation that a court will decrypt their briefs in the desired way."[80]  In any event, neither party recognized that the survival of the Trustee's federal claims is governed by federal law.  This raises serious questions regarding the level of due diligence exercised by the attorneys involved in the present dispute.[81]

---

[77] *Schreiber v. Sharpless*, 110 U.S. 76, 80 (1884); *Kirk v. Comm'r of Internal Revenue*, 179 F.2d 619, 620 (1950); *Wills v. The Heritage Bank (In re Willis)*, 226 B.R. 369, 374 (Bankr. E.D. Va. 1998); In re Eads, 135 B.R. at 385; *see* 7C C. Wright, A. Miller & M. Kane, Federal Practice and Procedure §§ 1952, 1954 (2011).

[78] *In re Wills*, 226 B.R. at 374.

[79] *See* the Trustee's argument with respect to Counts XII, XIV, XVII, XVIII, XIX, and XX as explained above.

[80] *Hermosilla v. Hermosilla (In re Hermosilla)*, 450 B.R. 276, 299 (Bankr. D. Mass. 2011).

[81] *See Maine Audubon Soc'y v. Purslow*, 907 F.2d 265, 268 (1st Cir. 1990) (holding counsel are to be held to standards of due diligence and objective reasonableness); *see also* Fed. R. Bankr. P. 9011(b)(2).

Nevertheless, as "a question of substantive law, the court must consider the question even if the parties are oblivious to it."[82]

Second, Krattenmacher asserts that apart from whether any of the Trustee's claims may actually have survived Anderson's death, I should nonetheless exercise my discretion under Fed. R. Civ. P. 25(a)(1) to deny the Motion to Substitute. He reasons that because Anderson was merely an agent acting on behalf of Plumb House or Dalton, none of the Trustee's claims are properly directed against him or that his continued involvement is otherwise unnecessary. The Amended Complaint, however, is pled against Anderson both individually and in his capacity as an agent of those entities. Therefore, dismissal on this basis is inappropriate.

### 1. State Law Claims

As a general rule, contract claims survive the death of a party.[83] At common law, however, tort claims did not survive the death of either the victim or the tortfeasor.[84] In an effort to abrogate the common law rule, which often produced strange and unfair results,[85] the Massachusetts legislature enacted Mass. Gen. Laws ch. 228, § 1, which provides:

> In addition to the actions which survive by the common law, the following shall survive:--
>    (1) Actions under chapter two hundred and forty-seven;[86]
>    (2) Actions of tort (a) for assault, battery, imprisonment or other damage to the person; (b) for consequential damages arising out of injury to the

---

[82] *In re Eads*, 135 B.R. at 384 n. 10.

[83] *Gasior v. Massachusetts Gen. Hosp.*, 446 Mass. 645, 649 (2006); *Rendek v. Sheriff of Bristol Cnty.*, 440 Mass. 1017, 1018 (2003); *McStowe v. Bornstein*, 377 Mass. 804, 806-807 (1979).

[84] *Sheldone v. Marino*, 398 Mass. 817, 818 (1986); *Harrison v. Loyal Protective Life Ins. Co.*, 379 Mass. 212, 214 (1979); *Putnam v. Savage*, 244 Mass. 83, 85 (1923).

[85] *See, e.g., Cravath v. Plympton*, 13 Mass. 454 (1816) (an action for tortiously obtained property survives the defendant only if the deceased acquired a pecuniary benefit from the trespass); *Towle v. Lovet*, 6 Mass. 394 (1810) (plaintiff's administrator may maintain an action for trover); *Mellen v. Baldwin*, 4 Mass. 480 (1808) (holding that an action for replevin or trover survives the death of the plaintiff, but not the defendant).

[86] Mass. Gen. Laws ch. 247, § 1 *et seq.* pertains to replevin.

person and consisting of expenses incurred by a husband, wife, parent or
guardian for medical, nursing, hospital or surgical services in connection
with or on account of such injury; (c) for goods taken or carried away or
converted; or (d) for damage to real or personal property; and

(3) Actions against sheriffs for the misconduct or negligence of
themselves or their deputies.[87]

Because tort actions generally abated at common law, a state law tort claim will not survive the

death of either party unless it fits within one of the provisions of the Survivor Statute.[88]

Turning first to Count IV for conversion, the answer would seem to be easy as conversion

is expressly included in the Survivorship Statute.[89]   Krattenmacher does not appear to contest

this much.  Nor does he contest that damages for purported harm done to the Debtor's equipment

would fall within the Survivorship Statute.[90]   Instead, he argues that the Debtor's employees,

contracts, and goodwill are intangibles that are neither "goods" nor "personal property" within

the meaning of the Survivorship Statute.  In support, he relies on a passage of an unpublished

decision of the Massachusetts Superior Court that stated "'damage to real or personal property,'

requires injury to something *tangible*."[91]   Contrary to his representation, perhaps ironically so,

that case did not involve a misappropriation claim, but a claim for misrepresentation.[92]   In *Cent.*

*Nat'l Gottesman, Inc. v. Rodman & Rodman, P.C.*, the plaintiff argued that the loss of money

through the fraud of the defendant amounted to a "damage to real or personal property" as

---

[87] Mass. Gen. Laws ch. 228, § 1.

[88] *Putnam v. Savage*, 244 Mass. at 85.

[89] *Id.*

[90] *See* Mas. Gen. Laws ch. 228, § 1(d).

[91] *Cent. Nat'l Gottesman, Inc. v. Rodman & Rodman, P.C.*, 1998 WL 1184176 *2 (emphasis added).

[92] *Id.* Similarly, *Piper v. Childs*, the decision of the Massachusetts Supreme Judicial Court which the Superior Court
cited, involved an action for deceit.  290 Mass. at 562.

contemplated by the Survivorship Statute.[93]   The Superior Court rejected that argument, finding

that a claim for fraud, which historically abated upon death, was not analogous to any

enumerated claim.[94]   It then said the "closest possibility" was damage to personal property, but

concluded that the Survivorship Statute required "something tangible."[95]

In this context, I understand the Superior Court's use of the word "tangible" to mean

"definite" or "certain," not "corporeal" or "physical."   This reading is consistent with

Massachusetts precedent.   In *Keating v. Boston Elevated Ry. Co.*, the Supreme Judicial Court

held that an action "'for damage to . . . personal property.' . . . 'does not apply to mere

impoverishing of a man's estate generally, but requires that damage to some specific property be

alleged and proved.'"[96]   Put another way, being out of pocket as a result of a tort, by itself, is not

a "damage to . . . personal property" under the Survivorship Statute.[97]   Instead, a specific

property right must be damaged.   The Supreme Judicial Court further explained the distinction in

*Bethlehem Fabricators v. H.D. Watts Co.*, stating:

> A claim for the tortious conversion or destruction of property, is based on a right
> to property which has a certain value. A claim for an injury to the property which
> is less than a conversion or destruction of it, is of the same character.'   By
> analogy, however, to the survival or nonsurvival of actions for 'damage to * * *
> property', causes of action for damage to the general estate, rather than to specific
> property, of an individual or corporation are not assignable. And a mere right to
> litigate for a fraud perpetrated upon an individual or a corporation resulting in
> damage personal in character or to the general estate does not survive—in the
> case of an individual—and is not assignable. This principle, however, is
> inapplicable where the damage is solely to specific property. . . . *The nature of the*

---

[93] *Cent. Nat'l Gottesman, Inc. v. Rodman & Rodman, P.C.*, 1998 WL 1184176 *2.

[94] *Id.*

[95] *Id.*

[96] *Keating v. Boston Elevated Ry. Co.*, 209 Mass. at 282 (*quoting Cutter v. Hamlen*, 147 Mass. 471, 472 (1888)).

[97] Mass. Gen. Laws ch. 228, § 1(d).

*damage sued for, not the nature of its cause, determines whether the action
survives.*[98]

There is simply no authority to support Krattenmacher's assertion that the Survivorship

Statute does not extend to claims involving recovery of or damages for intangible property.   To

the contrary, in *Curtis v. Herb Chambers I-95, Inc.,* the Massachusetts Appeals Court held that a

claim for damage to good will survived the death of a defendant.[99]   The court explained:

> As for the tortious interference with business relations claim, it suffices to note
> that the plaintiff alleges the loss of good will among the damages caused by the
> defendants. As the Supreme Judicial Court held over a century ago, "good will is
> property, and is a valuable asset in [an individual's] business." *George G. Fox Co.
> v. Glynn*, 191 Mass. 344, 348, 78 N.E. 89 (1906). The tortious interference claim
> thus seeks a remedy for an injury to a property interest. Consequently, it does
> survive. *See Sheldone v. Marino*, 398 Mass. 817, 819, 501 N.E.2d 504 (1986)
> (actions seeking redress for damage to property rights survive death).[100]

In light of this authority, I find that "goods" and "personal property" as used in the Survivorship

Statute must necessarily include the intangible, i.e., non-physical, assets of the Debtor.[101]

Additionally, these cases also stand for the proposition that a claim for tortious interference

---

[98] *Bethlehem Fabricators v. H.D. Watts Co.*, 286 Mass. 556, 566-567 (1934) (citations omitted) (emphasis added).

[99] *Curtis v. Herb Chambers I-95, Inc.*, 75 Mass. App. Ct. 662, 673 (2009), *rev'd in part on other grounds*, *Curtis v. Herb Chambers I-95, Inc.*, 458 Mass. 674 (2011) (finding that interference with advantageous business relations claim was preempted by the Federal Digital Millennium Copyright Act, 17 U.S.C. § 301).

[100] *Id.*

[101] Although there are no cases which define the limits of "goods" as that term is used in the Survivorship Statute, I see no reason why it would not similarly encompass intangible assets.  The Supreme Judicial Court in *Bethlehem Fabricators v. H.D. Watts Co.* explained that:

> A claim for the tortious conversion or destruction of property, is based on a right to property
> which has a certain value.  A claim for an injury to the property which is less than a conversion or
> destruction of it, is of the same character.

286 Mass. at 566.  Notably, the Supreme Judicial Court discussed conversion of "property" even though the Survivorship Statute refers to "goods . . . converted."  Mass. Gen. Laws ch. 228 § 1(c).  More importantly, this passage suggests that the Supreme Judicial Court views Mass. Gen. Laws ch. 228, §§ 1(c) and (d) as covering the full spectrum of claims involving personal property with the extremes being conversion or destruction on one end and simple injury or dispossession on the other.

survives the death of a party.[102]    Therefore, Counts IV, X, XVII, and XVIII all survived Anderson's death.

Under Massachusetts law, there are two causes of action that are referred to as civil conspiracy.[103]  The first is for a type of coercive civil conspiracy where the "plaintiff must allege that defendants, acting in unison, had 'some peculiar power of coercion' over plaintiff that they would not have had if they had been acting independently."[104]    The "second type of civil conspiracy is more akin to a theory of common law joint liability in tort."[105]    Regardless of which theory of civil conspiracy is pled, "[t]he averment of a conspiracy does not ordinarily change the nature of the cause of action nor add to its legal force."[106]  Therefore, to the extent that the Trustee's claim under Count V alleges a civil conspiracy to "commit a tortious act . . . including . . . tortious seizure and expropriation of all [the Debtor's] property,"[107] the claim is for the conversion of or damage to personal property.[108]    As such, the Count V falls within the Survivorship Statute and survived Anderson's death.

Whether a claim under Mass. Gen. Laws ch. 93A survives the death of a defendant depends in part on whether the claim ultimately rests upon a contract or a tort theory.   As explained above, contract claims do not abate upon the death of a party.  Here, however, there is

---

[102] *Bethlehem Fabricators v. H.D. Watts Co.*, 286 Mass. at 567; *Curtis v. Herb Chambers I-95, Inc.*, 75 Mass. App. Ct. at 673.

[103] *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir. 1994).

[104] *Jurgens v. Abraham*, 616 F.Supp. 1381, 1386 (D. Mass. 1985) (*quoting Fleming v. Dane*, 304 Mass. 426, 50 (1939)).  *See Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d at 1563.

[105] *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d at 1564 (*citing Gurney v. Tenney*, 197 Mass. 457 (1908)).

[106] *Phelan v. Atlantic Nat. Bank of Boston*, 301 Mass. 463, 467 (1938).

[107] Amended Complaint, Docket No. 146 at ¶ 112.

[108] *See* Mass. Gen. Laws ch. 228, §§ 1(c), (d).

no allegation that Anderson, in his individual capacity, entered into any contract with the Debtor. Therefore, if Count XI is to survive against Anderson, it must be premised on a theory of tort that falls within the provisions of the Survivorship Statute.

Having reviewed the Amended Complaint, the tort based allegations under Count XI generally fall into three categories: (1) those regarding the Defendants' appropriation of the Debtor's assets; (2) those regarding the Defendants' interference with the Debtor's contracts; and (3) those regarding the Defendants' other "unfair and deceptive practices."  Claims falling in category 3 are effectively claims for deceit, which the Supreme Judicial Court has repeatedly held do not survive the death of a party.[109]  The remaining claims are essentially the same claims that the Trustee asserts under the counts previously discussed.  Therefore, I find that Count XI abated in part and survived in part.

With respect to Count XIX seeking equitable estoppel, the Trustee alleges that "[t]he Anderson Defendants made representations and commitments intended to induce the Debtor to embark upon a course of conduct . . . [and] failed to act as represented, thus causing the Debtor to suffer substantial harm and damage."[110]  As previously noted, however, claims for fraud and misrepresentation abate upon the death of a party.   Therefore, Count XIX did not survive Anderson's death and must be dismissed.

Turning to the last of the Trustee's state law claims, the Supreme Judicial Court has described a constructive trust as follows:

> A constructive trust may be said to be a device employed in equity, in the absence
> of any intention of the parties to create a trust, in order to avoid the unjust

---

[109] *See, e.g., Piper v. Childs*, 290 Mass. at 562; *Bethlehem Fabricators v. H.D. Watts Co.*, 286 Mass. at 566-567; *Keating v. Boston Elevated Ry. Co.*, 209 Mass. at 282.  *See also Cent. Nat'l Gottesman, Inc. v. Rodman & Rodman, P.C.*, 1998 WL 1184176 *2.

[110] Amended Complaint, Docket No. 146 at ¶¶ 165, 167.

enrichment of one party at the expense of the other where the legal title to the property was obtained by *fraud* or in violation of a fiduciary relation or arose where information confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information.[111]

Again, as claims for fraud and misrepresentation abate upon the death of a party,[112] I find that Count XX did not survive Anderson's death and must be dismissed.

### 2. Federal Claims

The first step in assessing whether a federal claim survives the death of a party is to look to the statute underlying the cause of action to determine the intent of Congress.[113] While Fed. R. Bankr. P. 1016 addresses the death or incapacity of the debtor, there is no express provision of the Bankruptcy Code or Federal Rules of Bankruptcy Procedure providing for the survival of actions for equitable subordination under 11 U.S.C. § 510(c),[114] turnover under 11 U.S.C. § 542,[115] avoidance of fraudulent transfers under 11 U.S.C. § 548,[116] avoidance of unauthorized

---

[111] *Barry v. Covich*, 332 Mass. 338, 342 (1955) (emphasis added).

[112] *See, e.g., Piper v. Childs*, 290 Mass. at 562; *Bethlehem Fabricators v. H.D. Watts Co.*, 286 Mass. at 566-567; *Keating v. Boston Elevated Ry. Co.*, 209 Mass. at 282. *See also Cent. Nat'l Gottesman, Inc. v. Rodman & Rodman, P.C.*, 1998 WL 1184176 *2.

[113] *In re Wills*, 226 B.R. at 374; *In re Eads*, 135 B.R. at 385.

[114] Section 510(c) provides:

  (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--
        (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
        (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

[115] Section 542 provides in relevant part:

  Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

post-petition transfers under 11 U.S.C. § 549,[117] or violations of the automatic stay[118] after the

death of the defendant.  Because the statute does not provide the answer, I must turn to the

federal common law.[119]

---

11 U.S.C. § 542(a).

[116] Section 548(a)(1) provides in relevant part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
>
> * * *
>
> > (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> > > (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> > > (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> > > (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
> > > (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

[117] Section 549 provides in relevant part:

> (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate--
> > (1) that occurs after the commencement of the case; and
> > (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
> > > (B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a).

[118] Section 362 provides in relevant part:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--
> > (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

This presents no easy task.  As the United States Court of Appeals for the First Circuit has explained:

> The federal courts over the years have given a great deal of study to the general problem of survival, . . . . We see no occasion here to canvass the general problem again or to trace its gradual development. It will suffice for present purposes to say that it was authoritatively established many years ago in *Schreiber v. Sharpless*, . . . that 'At common law, actions on penal statutes do not survive * * *', and that 'The right to proceed against the representatives of a deceased person depends, not on forms and modes of proceeding in a suit, but on the nature of the cause of action for which the suit is brought', in other words 'Whether an action survives depends on the substance of the cause of action, not on the forms of proceeding to enforce it.'[120]

Therefore, to determine the "substance of the cause of action," federal courts typically conclude that "causes of action based on 'penal' statutes abate, while those based on 'remedial' statutes

---

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

* * *

(k)(1) Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

(2) If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages.

11 U.S.C. §§ 362(a), (k).

[119] *In re Wills,* 226 B.R. at 374; *In re Eads,* 135 B.R. at 385.

[120] *Kirk v. Comm'r of Internal Revenue*, 179 F.2d at 620 (*quoting Schreiber v. Sharpless*, 110 U.S. at 80).

survive."[121]  Generally speaking, "[a] remedial action is one that compensates an individual for a specific harm suffered, while a penal action imposes damages upon the defendant for a general wrong to the public."[122]

Although the Supreme Court of the United States has rejected the notion that Congress had a single purpose in enacting the Bankruptcy Code,[123] it has also stated that "we are mindful that the Bankruptcy Code aims, in the main, to secure equal distribution among creditors."[124] With respect to turnover under 11 U.S.C. § 542, the United States Court of Appeals for the First Circuit has explained that:

> A turnover action is not an action to recover damages for the taking of estate property but an action to recover possession of property belonging to the estate at the time of the filing. It invokes the court's most basic equitable powers to gather and manage property of the estate.[125]

In this sense, an action for turnover merely seeks to put the Trustee in possession of property which 11 U.S.C. § 541(a) has already defined as property of the estate so that it may be properly distributed for the benefit of all creditors.  Similarly, the purpose of the Bankruptcy Code's avoidance provisions, such as 11 U.S.C. §§ 548 and 549, are to preserve the estate against illegitimate depletions for the benefit of all creditors.[126]  Indeed, the "[u]nderlying purpose of the

---

[121] *In re Eads*, 135 B.R. at 385.  *See First Nat'l Bank & Trust Co. v. Flatau (In re Wood)*, 643 F.2d 188, 190 (5th Cir. 1980).

[122] *United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993); *In re Wood*, 643 F.2d at 190-191.

[123] *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008).

[124] *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006); *see Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 227 (1930); *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 451 (1937).

[125] *Braunstein v. McCabe (In re McCabe)*, 571 F.3d 108, 122 (1st Cir. 2009) (*citing* 5 Collier on Bankruptcy ¶ 542.02 (15th rev. ed. 2009)).

[126] *Aalfs v. Wirum (In re Straightline Inv., Inc.)*, 525 F.3d 870, 878 (9th Cir. 2008); *Burkart v. Coleman (In re Tippet)*, 542 F.3d 684, 689-690 (9th Cir. 2008); *French v. Liebmann (In re French)*, 440 F.3d 145, 152 (4th Cir. 2006).

fraudulent transfer statute is to 'prevent valuable assets from being transferred away from debtors in exchange for less than fair value, leaving insufficient funds to compensate honest creditors,'"[127] while 11 U.S.C. § 549 allows a trustee to recover certain unauthorized postpetition transfers "'to ensure that similarly situated pre-petition creditors are treated even-handedly.'"[128] For these reasons, I find that 11 U.S.C. §§ 542, 548, and 549 are not penal, but remedial in nature.  Therefore, Counts I, II, and III survived Anderson's death.

As succinctly stated by the First Circuit in *In re Soares*: "[t]he automatic stay is among the most basic of debtor protections under bankruptcy law."[129]   Nevertheless, like the Bankruptcy Code generally, the automatic stay also serves more than one purpose:

> While giving the debtor some breathing room, the automatic stay also ensures that the assets of a debtor are not reduced or disturbed and protects the bankruptcy court's exclusive jurisdiction over the debtor and its property.[130]

Section 362(k) "specifically and proportionately redresses personal injuries resulting from violations of the automatic stay" and is thus remedial.[131]  Other courts have even concluded that claims for punitive damages under 11 U.S.C. § 362(k)(1) do not abate upon the death of a party as a "penal" claim, reasoning that:

> [T]his statutory provision compensates those other losses rationally related to violating the stay, which remain difficult to quantify. In appropriate circumstances, Congress has permitted a punitive damages award to encompass such losses, in addition to sums for deterrence purposes.[132]

---

[127] *Official Comm. of Unsecured Creditors v. Liberty Savs. Bank, FSB (In re Toy King Distrib., Inc.)*, 256 B.R. 1, 127 (Bankr. M.D. Fla. 2000) (*quoting* 4 Collier on Bankruptcy, ¶ 548.01 at 548–4–24 (15th ed. 1993))

[128] *Adams v. Hartconn Assocs., Inc. (In re Adams)*, 212 B.R. 703, 714 (Bankr. D. Mass. 1997) (*quoting Dave Noake, Inc. v. Harold's Garage, Inc. (In re Dave Noake, Inc.)*, 45 B.R. 555, 557 (Bankr. D. Vt. 1984)).

[129] *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969 (1st Cir. 1997).

[130] *In re Mohawk Greeenfield Motel Corp.*, 239 B.R. 1, 5 (Bankr. D. Mass. 1999).

[131] *In re Wills*, 226 B.R. at 375.

[132] *Id.* (*citing Eads*, 135 B.R. at 387).

Accordingly, I find that Count XIV also survived Anderson's death.

Through Count XII, the Trustee asserts that "any and all claims of the Defendants against [the Debtor] should be equitably subordinated to the claims of all other creditors . . . in accordance with 11 U.S.C. § 510."[133]   The United States Court of Appeals for the Third Circuit has described:

> equitable subordination as a "remedial rather than penal" doctrine designed "to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results."[134]

Despite the remedial nature of the relief he seeks, I find that the Trustee has not stated a claim for equitable subordination under 11 U.S.C. § 510(c) that is plausible on its face because the Amended Complaint is devoid of any allegation that Anderson has a claim against the Debtor.[135] In light of the Trustee's failure to plead an essential element, dismissal of Count XII as to Anderson is warranted.

## V. CONCLUSION

In light of the foregoing, I will enter an order granting the Motion to Substitute to the extent that the Trustee's claims under Counts I, II, III, IV, V, X, XIV, XI, XVII, and XVIII survived Anderson's death.   Counts XIX and XX, and Count XI to the extent that it seeks recovery for "unfair and deceptive practices," did not survive Anderson's death and must be

---

[133] Amended Complaint, Docket No. 146 at ¶ 141.

[134] *Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) (*quoting Citicorp Venture Capital, Ltd.v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233–234 (3d Cir. 2003)).  *See also Merrimac Paper Co., Inc. v. Harrison (In re Merrimac Paper Co., Inc.)*, 420 F.3d 53, 59 (1st Cir. 2005); *Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332, 1353 (1st Cir. 1992); *Boyajian v. Defusco (In re Giorgio)*, 862 F.2d 933, 938-939 (1st Cir. 1988).

[135] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); Fed. R. Civ. P. 12(b)(6), made applicable to adversary proceedings by Fed. R. Bankr. P. 7012(b).

dismissed.   Count XII for equitable subordination is dismissed for failure to state a plausible claim for relief.

_William C. Hillman_

_____
William C. Hillman
United States Bankruptcy Judge

Dated: December 19, 2011

Counsel Appearing:

Alan L. Braunstein, Mark W. Corner, Paul S. Samson, Riemer & Braunstein, LLP, Boston, MA, for Joseph G. Butler, the Chapter 7 trustee
Anthony J. Cichello, Hugh Dun Rappaport, Vincent J. Pisegna, Krokidas & Bluestein, LLP, Newton, MA, for the Charles G. Krattenmacher, Jr.